**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

vs.

CURTIS JOHN STORDAHL,

Defendant.

**CR 26-21-GF-BMM**

**ORDER ON MOTIONS TO SUPPRESS AND DISMISS**

## INTRODUCTION

A grand jury indicted Curtis John Stordahl ("Stordahl") with one count of knowingly possessing a silencer not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841 and 5861(d), and one count of knowingly possessing a rifle having a barrel of less than 16 inches in length not registered to him in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5841 and 5861(d). (Doc. 1.) A grand jury issued a superseding indictment on September 16, 2026, alleging that Stordahl possessed the silencer between September 2025 and November 17, 2025. (Doc. 41.) The superseding indictment alleges that Stordahl possessed the short-barreled rifle between September 2023 and November 2025. (*Id.*)

Stordahl seeks to suppress evidence seized through a search warrant that he

challenges due to overbreadth. (Doc. 20.) Stordahl also seeks to dismiss the indictment on the grounds that the crime of possession of unregistered firearms proves facially unconstitutional. (Doc. 35 at 1.) The Government opposes both motions. (Doc. 27; Doc. 50.) The Court held a hearing on the matters on October 27, 2026. (Doc. 52.)

## BACKGROUND

### Factual Background.

The Great Falls Police Department ("GFPD") received a report on November 14, 2025, at approximately 12:45 P.M., that Curtis Stordahl had threatened his neighbor, Isaac Holland, with an AR-15. (Doc. 27 at 3.) Holland stated that Stordahl had threatened Holland with the AR-15 and shoved him. (*Id.*) Holland stated that Stordahl smelled of alcohol and parked his van, with the words "Bath Planet" painted on the side, at 604 Willowcreek Court. (*Id.*) GFPD received another call at a similar time on November 14, 2025, reporting domestic violence at Willowcreek Court. (*Id.*) The caller stated that Curtis Stordahl was violent, "going off like crazy," escalating, with threats to kill the caller, and that Stordahl had a room full of weapons, including hunting rifles, .45's, and pistols. (*Id.*, citing Ex. 2.)

GFPD dispatched officers six minutes later to investigate the threat involving an AR-15 at Willowcreek Court in Great Falls. (*Id.*) Officer Draper spoke with Holland a block away from the Willowcreek cul-de-sac after arriving at the scene.

(*Id*. at 3-4.) Holland informed Officer Draper that Malori Cooper, Holland's girlfriend, advised Holland that Stordahl had tailgated Cooper as she drove home. (*Id*. at 4.) Cooper acknowledged that she had been driving slowly. (*Id*.) Stordahl stopped at the end of Holland's and Cooper's driveway and mouthed something through his window. (*Id*.) Holland walked to Stordahl's house to inquire what had happened with Cooper. (*Id*.)

Holland reported that Stordahl clearly appeared drunk when he answered the door. (*Id*.) Holland attempted to clarify what happened with Holland to ensure that no trouble existed between Stordahl and Cooper. (*Id*.) Holland reported that Stordahl responded that "[n]o one really comes down here, this is my end of the cul-de-sac." (*Id*.) Holland reported that he told Stordahl to have a good day, the men fist-bumped, and then Stordahl said have a good day and slammed the door behind Holland. (*Id*.)

Holland reported that Stordahl then sped to Holland's house, got out of his van, and had an AR-15 in his hands. (*Id*.) Holland reported that again he could smell alcohol on Stordahl's breath as Stordahl asked "[y]ou got a fucking problem?" and "[y]ou want to threaten my family?" (*Id*.) Holland told Stordahl that he had not gone to Stordahl's house meaning any harm. (*Id*.) Holland reported that Stordahl stood, pointing the AR-15 at Holland, for 7 or 8 minutes. (*Id*.) Holland reported that Stordahl held the rifle at the low-ready position after shoving Holland into his car. (*Id*.) Stordahl put the rifle into his van and challenged Holland to a fist fight. (*Id*.)

Holland declined. (*Id.*)

Holland described the rifle to the GFPD officers as an AR-15, not a pistol. (*Id.*) Officers asked Holland to distinguish the rifle from any other AR. (*Id.*) Holland described the AR-15 as having a little flag near the sight and a tan barrel. (*Id.* at 4-5.) Holland reported Stordahl had not scared him but he also clarified that "[e]ven if I was scared, I would have a hard time admitting to it in a setting like this." (*Id.* at 5.)

Holland checked who owns 604 Willowcreek Court after the incident. (*Id.*) Holland called the number and spoke with a woman who stated that this type of incident had happened previously with another neighbor. (*Id.*) Holland decided to call the police. (*Id.*)

Officer Draper spoke with Cooper at the scene. Cooper reported that Stordahl had followed close behind her and was "on her" as she pulled into her driveway as she was coming home from getting gas. (*Id.*) Cooper reported that Stordahl showed frustration, looked angry, and mouthed something before driving off. (*Id.*) Cooper reported that she felt very uncomfortable. (*Id.*) Cooper confirmed that Holland went to talk to Stordahl, but Stordahl did not really want to talk. (*Id.*)

Cooper reported that she and Holland were cleaning the back of their car when Stordahl pulled up and jumped out of his car with a "big old gun" and walked up to Holland and shoved Holland into the car. (*Id.*) Cooper ran inside and grabbed her 5-

year-old daughter and watched the rest of their interaction form inside. (*Id.*) Cooper stated "[y]eah I was scared! I don't do guns!" (*Id.*) Cooper reported she was concerned for their safety because Stordahl already was mad at her. (*Id.*) Other officers spoke with the other caller, the alleged PFMA victim, about that incident. (*Id.* at 5-6.)

Officer Draper arrived at the Cascade County Attorney's Office at 2:33 P.M. on November 14, 2025, to apply for a search warrant. (*Id.* at 6, citing Ex. 2.) Officer Draper signed an affidavit in support of a search warrant, case No. 25-550, seeking to search 604 Willowcreek Court as well as the van. (*Id.*, citing Ex. 1.) The application described the crimes under investigation as assault with a weapon in violation of Mont. Code Ann. § 45-5-213, and partner family member assault in violation of Mont. Code Ann. § 45-5-206. (*Id.* at 6, Ex. 1)

The application states that the items sought in the search included knives, firearms and other dangerous weapons, including but not limited to AR-15 style rifles and any other firearms, and photographs to document the interactions with the PFMA victim Haas. (*Id.*, Ex. 1.) The application described the places to be searched as the residence at 604 Willowcreek Court and a van registered to Bath Planet parked at 604 Willowcreek Court, in Great Falls, Cascade County, Montana. (*Id.*, Ex. 1.) The following facts supported the application:

> On Friday, November 14th, 2025, Officer DRAPER responded to a report of a disturbance with a neighbor. The caller stated that an altercation

with the neighbor happened in which the neighbor, who was later identified as Curtis STORDAHL, got into the caller[']s face and shoved him while holding an AR-15 rifle.

Officer DRAPER spoke with caller, Issac HOLLAND, who had advised Officer DRAPER that his girlfriend, Malori COOPER, came home and advised their neighbor (STORDAHL) had a road-rage incident behind her in which he was following to[o] close to the back of her vehicle. STORDAHL then proceeded to follow COOPER home and stopped at the end of the driveway while COOPER pulled into the residence. COOPER told HOLLAND that STORDAHL was yelling through the window of his vehicle but never rolled it down. COOPER went inside and told HOLLAND what had happened.

HOLLAND advised he went and knocked on STORDAHL's door and STORDAHL answered. HOLLAND told Officer DRAPER that he believed STORDAHL was drunk because be could smell alcohol on him. HOLLAND advised Officer DRAPER that he wanted to make sure there were no issues with any of the neighbors. HOLLAND advised that STORDAHL didn't say much and didn't want to talk. HOLLAND advised he then left the property back to his residence (in the same cul-de-sac). HOLLAND advised COOPER and himself were out in the driveway cleaning COOPERS car when STORDAHL's van accelerated up the cul-de-sac at a high rate of speed and stopped in front of the driveway. HOLLAND advised STORDAHL got out of the van and was carrying an AR-15 style rifle. HOLLAND advised he knew what kind of rifle it was because he served in the United States Army. HOLLAND advised that STORDAHL shoved him against his girlfriend's car and stated something to the effect of "What's up motherfucker" and "I'll shoot you if I see you again." HOLLAND advised that STORDAHL's actions scared COOPER and COOPER's daughter (5 y.o.a).

Officer DRAPER then spoke with COOPER who advised that she was driving home from the gas station when the vehicle behind her appeared aggravated and started following her too closely. Everything stated by HOLLAND was re-stated by COOPER. COOPER advised that once STORDAHL got out of the vehicle with the rifle she ran inside and locked the door. COOPER advised that she was terrified that STORDAHL was going to possibly shoot because COOPER was the one STORDAHL was initially mad

> at during the road rage incident. COOPER advised that she watched STORDAHL shove HOLLAND into the vehicle.
>
> Right around the same time that Officer DRAPER was taking the complaint, STORDAHL's mother-in-law was calling in a welfare check on STORDAHL and advised there had been a disturbance between STORDAHL and his wife, who was identified as Amanda HAAS. HAAS was spoken to by Detective KINSEY (GFPD #299) regarding STORDAHL. HAAS advised that there had been a physical disturbance on Sunday, (Nov 9th) between STORDAHL and HAAS. HAAS stated that STORDAHL accused HAAS of cheating on him and shoved her into the wall. STORDAHL then punched a hole in the wall next to HAAS' head. HAAS was terrified to go home and had told her mother about it prompting the welfare check call.
>
> Dispatch showed STORDAHL to have an alert for carrying firearms in his vehicle and the house. Furthermore, HAAS' mother confirmed that STORDAHL is in possession of a large number of firearms and has been escalating in his behaviors.

(Doc. 6, Ex. 1.)

Officer Draper sought the "search warrant to seize all of the firearms to ensure that the victim can identify which firearm was used and to further prevent the Defendant Stordahl from using a firearm on anyone as threatened." (*Id.*) The remainder of the affidavit focuses on Officer Draper's training and experience in law enforcement, types of investigations he has conducted in his career, including violent offenses. (*Id.*) Officer Draper also attested to his knowledge that "the above-described articles, items, and things which may constituted evidence, contraband, articles, or may be fruits of, or related to, or connected with the above-described offenses facts, and circumstances will be located at, in, or about the above-described

places, locations, and premises." (*Id.*)

Montana State District Court Judge Elizabeth Best signed the warrant authorizing the search of the house and van for items requested by the application. (*Id.* at 8, Ex. 1.) Officers with the Central Montana High Risk Unit contacted Stordahl at approximately 3:51 P.M. on November 14, 2025, and took Stordahl into custody. (*Id.* at 8-9, Ex. 2.) Officers began to search the van and the house after the house had been cleared. (*Id.* at 9, Ex. 3.) Officers observed nothing of note in the van other than beer cans. (*Id.*)

Officer Draper noted that one of the rooms on the second floor of the house had been outfitted to be a gun room. (*Id.*) The room had a bench for loading ammunition and working on firearms. (*Id.*) Officer Draper found several firearms in the closet of the room. (*Id.*) The closet had a wooden gun rack in it and stored several rifles, both in AR style and bolt action rifles. (*Id.*) A large rifle with a suppressor on it was in the closet, as well as AR style rifles with red, white, and blue colors near the sight that could resemble a flag. (*Id.*) One of those rifles, an AR-15 style rifle, had a tan magazine and a tan angled grip on it. (*Id.*) This rifle also had red, white, and blue colors resembling a flag on it. (*Id.*)

The search warrant return listed the items seized as the following:

1. Defiance 25Creedmore, SN: SDB1986
2. Palmetto AR-15, SN: SCD087892
3. Palmetto 9mm, SN: X9-024346

4. Bolt action rifle, SN: GN387316
5. Walther PK380, SN: SB141898
6. Defiance 25Creedmore, SN: 61A019455

(*Id*. at 10, citing Ex. 1.) Officer Draper, pursuant to the search warrant, seized all firearms, including two additional firearms beyond the original AR-15, that remain the subject of this indictment. (Doc. 21 at 5.) The relevant firearms are a Defiance rifle with a suppressor attached to it and a Palmetto, model PX9, 9mm rifle, serial number, X9-024346, that the ATF later determined had a barrel length less than 16 inches. (*Id*.) Stordahl asserts that both firearms may be possessed legally, so long as one properly registers them. (*Id*.)

**Legal Framework.**

The National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1936) ("NFA") made possession of unregistered firearms in violation of 26 U.S.C. §§ 5841 and 5861(d) a crime. NFA regulates short-barreled shotguns, short-barreled rifles, silencers, and "any other weapon[s]." 26 U.S.C. § 5845(a). NFA also requires all covered firearms to be registered in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5841(a). A person may not receive or possess a firearm that was transferred or made in violation of the statute that is not registered to that person. 26 U.S.C. § 5861(b)-(d). NFA also historically has required two types of taxes. The first requires importers, manufacturers, and dealers to pay an annual special occupation tax. 26 U.S.C. § 5801(a). The second imposed a $200 tax on those who transferred

or made a listed firearm. *Mock v. Garland*, 75 F.4th 563, 569 (5th Cir. 2023). Congress made NFA enforceable by criminalizing the import, manufacture, transfer, receipt, possession, or transport of a firearm that does not conform with NFA. 26 U.S.C. §§ 5861 and 5871.

The One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) ("OBBB"), eliminated the transfer and making taxes on short-barreled shotguns and rifles, silencers, and "all other weapon[s]." 139 Stat. at 247-48. The transfer and making taxes for these firearms currently stands at $0. 26 U.S.C. §§ 5811(a) and 5821(a). OBBB scheduled the effective date for these amendments on "calendar quarters beginning more than 90 days after the date of the enactment of this Act." Pub. L. 119-21 § 79436(d). The effective date was January 1, 2026. (Doc. 50 at 4.)

## LEGAL STANDARD

### Motion to Suppress

The Fourth Amendment guarantees the right to be free from unreasonable search and seizure. The Fourth Amendment's "overriding function" protects personal privacy and dignity against unwarranted intrusion by the State. *Schmerber v. California*, 384 U.S. 757, 767 (1966). "To enforce the Fourth Amendment's prohibition against 'unreasonable searches and seizures,'" courts "exclude evidence obtained by unconstitutional police conduct." *Utah v. Strieff*, 579 U.S. 232, 234-35 (2016). "The Fourth Amendment does not proscribe all state-initiated searches and

seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Consistently, the "touchstone" of a court's analysis under the Fourth Amendment "is always 'the reasonableness in all the circumstances of the particular government invasion of a citizens personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) (quoting *Terry, v. Ohio*, 392 U.S. 1, 19 (1968)). "[T]here is no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Terry*, 392 U.S. at 21 (internal quotation marks omitted).

**Motion to Dismiss**

A defendant may move to dismiss an indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). The "court is bound by the four corners of the indictment" when deciding a motion to dismiss under Rule 12. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). An indictment must provide a "plain, concise and definite written statement" of the essential facts constituting the offense charged." Fed. R. Crim P. 7(c)(1). A court must accept as true the facts alleged in the indictment when analyzing whether a cognizable offense has been charged. *Boren*, 278 F.3d at 914.

## DISCUSSION

### I. Whether The Warrant Was Overbroad.

Stordahl argues that the search warrant proved invalid due to overbreadth as

the affidavit lacked probable cause, failed to set forth objective standards, and the items could have been described in a more particular light. (Doc. 21 at 5.) The Court will address each argument in turn.

Stordahl argues that the search warrant lacked probable cause to "search for and seize all the items of a particular type described in the warrant." (*Id*. at 6., citing *Millender v. County of Los Angeles*, 620 F.3d 1016, 1025 (9th Cir. 2010), *rev'd on other grounds sub nom, Messerschmidt v. Millender*, 565 U.S. 535, 549 (2012)). Stordahl specifically asserts that the search warrant lacked probable cause to seize all "dangerous weapons, including but not limited to AR-15 style rifles and any other firearms" within Stordahl's residence. (*Id*.)

The Fourth Amendment prohibits the issuance of a warrant except one "particularly describing the place to be searched and the persons or things to be seized." *United States v. Green*, No. CR 19-05-BLG-SPW-02, 2019 WL 1643661, at *3 (D. Mont. Apr. 16, 2019). This requirement seeks to limit authorization to "specific areas and things for which there is probable cause to search." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The Ninth Circuit "read[s] the Fourth Amendment as requiring 'specificity,' which has two aspects, 'particularity and breadth.'" *Millender v. Cnty. of Los Angeles*, 620 F.3d 1016, 1024 (9th Cir. 2010), *rev'd sub nom. Messerschmidt v. Millender*, 565 U.S. 535 (2012) (quoting *United States v. SDI Future Health, Inc.,* 568 F.3d 684, 702 (9th Cir. 2009)).

"Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *SDI Future Health, Inc.*, 568 F.3d at 702 (quoting *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-57 (9th Cir. 1991)). The Ninth Circuit considers the following questions in determining whether a warrant's description is sufficiently specific to meet these Fourth Amendment requirements:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

The Court finds unpersuasive Stordahl's argument that the officers possessed probable cause to search only for the AR-15 rifle described by Holland and not any other firearms. This assertion may have held weight if the search warrant application included only facts about the incident described by Holland and Cooper. The search warrant application also includes information, however, about the welfare check call from Stordahl's mother-in-law, Haas's mother, about the domestic violence incident and the large number of firearms in the home. (Doc. 27 Ex. 1.) The application specifically sought to seize all firearms both for identification purposes and to ensure

that Stordahl could harm no one with a firearm as he allegedly had threatened on both earlier occasions. (*Id.*)

Unlike *Millender*, information in the warrant "provid[ed] a basis for concluding there was probable cause to search for or seize the generic class of firearms [] listed in the search warrant." 620 F.3d at 1025. The Court notes the probable cause standard "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). Warrants are properly issued based on non-technical, common-sense judgments. *Illinois v. Gates*, 462 U.S. 213, 235-36 (1983). A magistrate needs only a substantial basis for concluding that probable cause existed under the totality of the circumstances. *Id.* at 238-39.

The officers included evidence of two separate incidents, one directly involving a firearm, and both involving threats, fear for safety, and concerns about firearm possession. The search warrant sought evidence that would aid in proving charges related to assault with a weapon and partner family member assault. *See e.g., Messerschmidt*, 565 U.S. at 551 (citing *Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294 (1967)). The seized items could have been used to substantiate Stordahl's threats or could have been the firearm used in the assault. The search warrant included probable cause to search for the AR-15 among additional firearms. Stordahl fails to prove overbreadth.

The next requirement in the framework directs that the warrant set out

objective standards by which executing officers can differentiate items subject to seizure from those which are not. *See Spilotro*, 800 F.2d at 963. Stordahl argues that the warrant could have described the items to be seized in more detail, particularly the AR-15 rifle for which the officers had identifying information. (Doc. 21 at 7.) Stordahl concedes that "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." (Doc. 28 at 2, quoting *Spilotro*, 800 F.2d at 963 (citing *United States v. Cardwell,* 680 F.2d 75, 78 (9th Cir. 1982)).)

The Fourth Amendment mandates that warrants must describe both the location to be searched and the persons or property to be seized with sufficient particularity to allow law enforcement to reasonably identify them. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986); *United States v. Brobst*, 558 F.3d 982, 993 (9th Cir. 2009). This requirement exists to prevent "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). As to particularity, the law requires that descriptions in a warrant be "reasonably specific," not intricate or "elaborately detailed." *United States v. Brock*, 667 F.2d 1311, 1322 (9th Cir. 1982). The degree of specificity required "varies depending on the circumstances of the case and the type of items involved." *Spilotro*, 800 F.2d at 963.

"The [U.S.] Supreme Court has explained that the particularity requirement

of the Fourth Amendment 'makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *United States v. Monreal-Rodriguez*, No. CR-18-1905TUCJASJR, 2022 WL 2442238, at *10 (D. Ariz. Jan. 3, 2022), *report and recommendation adopted*, No. CR1801905TUCJASJR, 2022 WL 1957634 (D. Ariz. June 6, 2022) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). General searches or the seizure of one thing under a warrant that described another item proved impossible based on this warrant. Probable cause existed to seize all firearms, so no need existed for the search warrant to describe with specific particularity the AR-15 rifle at issue. The search warrant in this case differs from that viewed as unconstitutional in *United States v. Bridges*, 344 F.3d 1010, 1017 (9th Cir. 2003). The search warrant in *Bridges* authorized the collection of a "laundry list" of items that was "so expansive that its language authorized the Government to seize almost all of [the defendant's] property, papers, and office equipment." *Bridges*, 344 F.3d at 1017.

The Court recognizes that the search warrant could have described in greater detail the AR-15 observed by Holland. The Court finds that failure to do so did not render the search warrant unconstitutionally overbroad considering the wider scope of the danger presented and larger firearms threat. The specificity requirement for the things to be seized must depend on the nature and "the circumstances of the case

and the type of items involved." *Spilotro,* 800 F.2d at 963. The circumstances present here and the reasonable specificity in the description indicate that the search warrant proved sufficiently particular.

The Court turns next to Stordahl's arguments regarding the plain view doctrine. The plain view doctrine permits law enforcement to seize an item that comes within plain view during their lawful search of a private area under certain circumstances. *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971). The plain view doctrine applies definitionally to warrantless seizures. *Arizona v. Hicks*, 480 U.S. 321, 323 (1987). The Court has determined here that the warrant was issued based on probable cause and properly authorized seizure of firearms and other dangerous weapons.

The Court recognizes that *United States v. Holmes*, 36 F. Supp. 3d 970, 978 (D. Mont. 2014), clarifies that seizure of a firearm under the plain view doctrine is only justified where "per se evidence of immediately apparent criminality" exists. The Court acknowledges that the presence of the short-barreled rifle and firearm with a silencer could not have been immediate evidence of criminality. The officers did not know whether the firearms were registered, without reliance on another fact making it illegal for Stordahl to possess the firearms. This distinction does not alter the Court's analysis, because the plain view doctrine does not apply where officers were authorized to seize the items under the warrant as the Court had concluded

here.

The Court similarly will address the good faith exception. "Even if a warrant is unsupported by probable cause, suppression of the evidence found in a search pursuant to that warrant is not justified if the officers' reliance on the judge's determination of probable cause was objectively reasonable." *United States v. Embry*, No. CR-14-21-BLG-SPW-CSO, 2014 WL 1809388, at *11 (D. Mont. May 7, 2014), *report and recommendation adopted*, No. CR 14-21-BLG-SPW, 2014 WL 2505690 (D. Mont. June 3, 2014), *aff'd*, 625 F. App'x 814 (9th Cir. 2015) (citing *United States v. Needham,* 718 F.3d 1190, 1194 (9th Cir. 2013) (quoting *United States v. Leon*, 468 U.S. 897, 926 (1984))). "The United States, not the defendant, bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable." *Embry*, 2014 WL 1809388, at *11 (citing *United States v. Corral–Corral,* 899 F.2d 927 (10th Cir. 1990)).

The affidavit must establish "at least a colorable argument" for probable cause, and the officers must have relied on the search warrant in an objectively reasonable manner for the good faith reliance exception to apply. *United States v. Krupa,* 658 F.3d 1174, 1179 (9th Cir. 2011) (citations omitted). The inquiry does not address what the executing officer believed, or could have believed, but "whether a *reasonably well trained officer* would have known that the search was illegal despite the [judge's] authorization." *United States v. Luong,* 470 F.3d 898 (9th Cir.

2006) (emphasis added). The U.S. Supreme Court in *Leon* identified four situations that per se fail to satisfy the good faith exception. In these situations, "the officer will have no reasonable grounds for believing that the warrant was properly issued." *United States v. Underwood,* 725 F.3d 1076, 1085 (9th Cir. 2013) (quoting *Leon,* 468 U.S. at 922-23).

The four situations address the following factors: "(1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the judge wholly abandon[s] his [or her] judicial role; (3) where the affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon,* 468 U.S. at 922-23 (internal quotations omitted). The court "need not inquire further" if any of these four situations apply and can conclude that the good faith exception to the exclusionary rule does not apply. *Id.*

The Court concludes that none of the four situations existed here. The Court finds unpersuasive Stordahl's argument that the warrant proved so facially deficient as to invalidate a reasonable officer's reliance. The Court determines that even if the search warrant had proved unconstitutional in some manner, the good faith exception properly would apply and the exclusionary rule would remain inapplicable. *United*

*States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007). The Court declines to address severability.

### II. Whether Stordahl's Charge of Possession of Unregistered Firearms is Facially Unconstitutional.

Stordahl argues next that the crime with which he is charged, possession of unregistered firearms in violation of 26 U.S.C. §§ 5841 and 5861(d), is facially unconstitutional. (Doc. 35 at 1.) Stordahl relies on *Silencer Foundation, et al. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, et al.,* No. CV-25-56-H-JWH, 1 (N.D. TX. Aug. 5, 2026), for the proposition that certain sections of NFA do not generate any revenue from untaxed firearms and cannot be supported by Congress's taxation power. (*Id.* at 3.) *Silencer Shop* enjoined enforcement of NFA's regulatory requirements for untaxed firearms for exceeding Congress's enumerated powers. *Silencer Shop* at 25.

Stordahl does not contend that the scope of the *Silencer Shop* injunction extends to Stordahl. (Doc. 35 at 3.) Stordahl instead urges the Court to find unconstitutional NFA provisions governing Stordahl's charges for the same reasons as *Silencer Shop*. (*Id.* at 8.) The U.S. Supreme Court upheld NFA in 1937 on the premise that the annual $200 tax was "productive of some revenue" and thus operated as a tax within the national taxing power. *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937). The OBBB amendments to the NFA reduced that tax to $0. 26 U.S.C. §§ 5811(a) and 5821(a). *Silencer Shop* and Stordahl now assert that the

OBBB amendments eliminated the constitutional basis for the NFA's regulation of the applicable firearms. (Doc. 35 at 5-6) (citing *Silencer Shop* at 25.)

The Court need not consider the full ramifications of Stordahl's constitutional arguments. Stordahl first relies on *Silencer Shop* from the Western District of Texas, which does not bind the Court. The Court declines to follow the Western District of Texas and instead looks to binding Ninth Circuit precedent. The Ninth Circuit continues to recognize NFA as being grounded in Congress's power to tax. *United States v. DeBorba*, 177 F.4th 1005, 1012 (9th Cir. 2026).

The Court remains equally convinced by the Government's argument that Stordahl's conduct began before OBBB amendments went into effect. (Doc. 50 at 2.) Both counts of the superseding indictment originate before January 1, 2026, the effective date of OBBB amendments. (*Id.* at 4.) Count 1 alleges that Stordahl possessed a silencer on or about, and between September 2025 and November 17, 2025. (Doc. 42.) Count 2 alleges that Stordahl possessed a short-barreled rifle on or about, and between September 2023 and November 17, 2025. (*Id.*) Neither Stordahl nor *Silencer Shop* contend that NFA's regulations were unconstitutional before January 1, 2026.

Finally, Stordahl contends Stordahl should not be regulated by NFA, because the State of Montana ("Montana") is a plaintiff who benefits from the *Silencer Shop* injunction. (Doc. 35 at 3-4.) Montana joined *Silencer Shop* as one of 15 state

plaintiffs. *Silencer Shop* at 9. Each state alleged that their agencies and employees were injured by the compliance costs associated with acquiring and possessing NFA firearms for law enforcement purposes. *Id.* The Court declines to extend *Silencer Shop*'s injunction to Stordahl's private interests. *Silencer Shop* plaintiffs alleged permanent harm necessary to prevail on a permanent injunction, and Montana demonstrated its nonrecoverable compliance costs. *Silencer Shop* at 57-58. Montana's non-recoverable compliance costs included those of its agencies and employees. *Id.* at 9. The Court fails to see any connection between Stordahl's personal interests and those of Montana.

Accordingly, **IT IS HEREBY ORDERED** that Stordahl's Motion to Suppress (Doc. 20) is **DENIED.**

**IT IS FURTHER ORDERED** that Stordahl's Motion to Dismiss (Doc. 34) is **DENIED**.

**DATED** this 30th day of October, 2026.

Brian Morris, Chief District Judge
United States District Court